**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

TATTOO JOHNNY, INC.,
                            :   Docket No.: 08-cv-5572 LP

         Plaintiff,        :

                            :

    v.                      :

                            :

CHRISTIAN AUDIGIER, INC., SHOP ON   :
STAGE, INC., CHRISTIAN AUDIGIER, TY   :
BOWERS, MACY'S, INC.,        :
BLOOMINGDALE'S, INC., NORDSTROM,  :
INC., VANGUARD APPAREL LIMITED,
JOHN DOES 1-100, inclusive,

         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF RICHARD LACAVA IN SUPPORT OF DEFENDANTS**
**CHRISTIAN AUDIGIER, INC., SHOP ON STAGE, INC. AND CHRISTIAN**
**AUDIGIER'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF TATTOO**
**JOHNNY'S MOTION FOR A PRELIMINARY INJUNCTION AND EXPEDITED**
**DISCOVERY**

Richard LaCava (RL 1671)
Brian D. Siff (BS 6135)
DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 277-6500

Attorneys for Defendants
Christian Audigier, Inc., Shop on Stage, Inc., and Christian Audigier

## DECLARATION OF RICHARD LACAVA

I, Richard LaCava, hereby declare as follows:

1.      I am an attorney duly licensed to practice in the state and federal courts of New York. I am a partner with the law firm of Dickstein Shapiro LLP ("Dickstein"), attorneys for Defendants Christian Audigier, Inc., Shop On Stage, Inc. and Christian Audigier (collectively, "Defendants") in this action. I have personal knowledge of the matters stated herein and, if called as a witness, could and would testify competently thereto.

2.      As an attorney handling this litigation, I have possession, custody, supervision and control of Dickstein's records and documents relating to Defendants in general and to this action in particular. I state that the records and documents referred to in this Declaration constitute writings taken, made or received in the ordinary course of business of Dickstein at or near the time of the act, condition or event to which they relate, by persons employed by Dickstein who have a business duty to Dickstein to accurately and completely take, make, receive and maintain such records and documents.

3.      Pursuant to an agreement of the parties in this action, on or about July 7, 2008, Plaintiff produced to Defendants copies of documents relating to the creation and title of the designs in issue in this litigation ("Plaintiff's Designs"). As part of that production, Plaintiff produced copies of the designs that are at issue. At the bottom of the page for each design, the name of the artist of that design is listed. The Eagle design name Andrea Ale as the artist. The Knife and Rose design and the Skull Rose on Top design name Damien Friesz as their artist. True and correct copies of Plaintiff's Designs, which were produced to Defendants on or about July 7, 2008, are attached hereto as Exhibit "A" and incorporated by reference herein.

4.    Plaintiff's included in its July 7, 2008 document production pictures of various "Christian Audigier" garments that depict the designs at issue in this lawsuit. The pictures produced by Plaintiff appear to be print-outs from the "Christian Audigier" website. True and correct copies of the print-outs of Defendants' garments, which Plaintiff produced to Defendants on or about July 7, 2008, are attached hereto as Exhibit "B" and incorporated by reference herein.

5.    In relation to Plaintiff's Motion for Preliminary Injunction, I conducted internet research whereby I did a "Google" search for each of the names of the artists who purportedly created Plaintiff's Designs. The results of my search led me to two different websites that offer flash tattoo designs by Damien Friesz, that appear to be identical to the Knife and Rose and Skull Rose on Top designs offered for sale by Plaintiff. These websites are located at the domain names <*kingpintattoosupply.com*> and <*vosstattoos.com*>. The websites do not appear to be affiliated with Plaintiff. True and correct copies of printouts from the above-named websites depicting the artwork of Damien Friesz collectively are attached hereto as Exhibit "C" and incorporated by reference herein.

6.    On July 17, 2008, I took the deposition of Plaintiff's principal, David Bollt. True and correct copies of the relevant excerpts of Mr. Bollt's deposition transcript are attached hereto as Exhibit "D" and incorporated by reference herein.

7.    Plaintiff's Complaint and Motion for Preliminary Injunction in this action make repeated references to certain "Terms and Conditions" that accompany the purchase of any design from its website. Specifically, Plaintiff alleges in its Complaint that before consummating any transaction on its Website, a customer must agree to the Terms and Conditions found on the Website. Plaintiff's Complaint quotes the language of the Terms and

2

Conditions as it relates to the permitted use of Plaintiff's designs. Plaintiff, however, did not attach the Terms and Conditions to its Complaint, nor did Plaintiff attach them to its Motion for Preliminary Injunction.

8.    Because Plaintiff made repeated references to the Terms and Conditions, without attaching them as an exhibit to any of the papers filed with this Court, on or about July 16, 2008, I went to Plaintiff's website and printed the Terms and Conditions. Upon reviewing the Terms and Conditions, it is apparent that they contain a "Governing Law and Venue" clause that includes an arbitration provision. At Mr. Bollt's deposition on July 17, 2008, I showed Mr. Bollt a copy of the Terms and Conditions that I printed from Plaintiff's website, which I then marked as Exhibit 6 to Mr. Bollt's deposition. Mr. Bollt confirmed that Exhibit 6 to his deposition was Plaintiff's Terms and Conditions and that those were the Terms and Conditions in place at the time of Mr. Bower's alleged transaction. (See Bollt Depo., 32:4-35:3, attached hereto as Ex. D.) A true and correct copy of the Terms and Conditions, marked as Exhibit 6 to Mr. Bollt's deposition, are attached hereto as Exhibit "E" and incorporated by reference herein.

9.    At Mr. Bollt's deposition on July 17, 2008, I asked Mr. Bollt if the Plaintiff had entered into any license agreements with a t-shirt manufacturer. (See Bollt Depo., 78:4, attached hereto as Ex. D.) When Mr. Bollt responded that Plaintiff has a license with a t-shirt manufacturer (See Bollt Depo., 79:3-6), I requested that Plaintiff's counsel. Mr. Seider, provide Defendants with a copy of that agreement (See Bollt Depo., 80:11-12). On Friday, July 18, 2008, I had a telephone conversation with Mr. Seider asking him to produce a copy of the license agreement. During the telephone conference, Mr. Seider stated that the terms of the agreement were confidential, and that he was reluctant to produce the document absent a protective order. I acknowledged Mr. Seider's concerns and asked him to send a copy of the agreement along with

3

a proposed form of protective order. Mr. Seider agreed to do so. On Saturday, July 19, 2008, Mr. Seider and I exchanged e-mails regarding production of the license agreement, and Mr. Seider's contention that this document was outside of the Court's Order and thus did not require production. During the e-mail exchange, I reminded Mr. Seider that an exclusive license agreement is a document that may relate to title, and thus was within the scope of the Court's Order. Mr. Seider responded by stating that a redacted version of the license agreement would be produced. On 10:34 A.M., Mr. Seider produced a redacted version of the license agreement. Copies of the e-mail exchange is attached hereto as Exhibit F, and the produced redacted license agreement is attached hereto as Exhibit G.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed on this 21st day of July, 2008, at New York, New York.

_Richard LaCava_

Richard LaCava, Declarant

DOCSNY-319770

EXHIBIT  A



 Copyright 2007  TattooJohnny.com
Artwork by Andrea Alé



Copyright 2007  TattooJohnny.com
Artwork by Damien Friesz



Copyright 2007  TattooJohnny.com
Artwork by Damien Friesz

EXHIBIT  B  1  of  2





EXHIBIT  B  2  of  2







EXHIBIT  C



*Damien Friesz Skull Flash Set 2006*



## Damien Friesz Skull Flash Set 2006

**Damien Friesz Skull Flash Set 2006 – 5 color sheets w/lines**
**Price:** $65.00
Buy Product Online | Visit Store
Home

**Other Items from Damien Friesz**

**Damien Friesz Hands Flash Set #1** - Damien Friesz Hands Flash Set #1
**Damien Friesz Hands Flash Set #2** - Damien Friesz Hands Flash Set #2
**Damien Friesz Chest Panels Flash Set #1** - Damien Friesz Chest Panels Flash Set #1
**Damien Friesz Half Sleeves Flash Set #1** - Damien Friesz Half Sleeves Flash Set #1
**Damien Friesz Half Sleeves Flash Set #2** - Damien Friesz Half Sleeves Flash Set #2
**Damien Friesz Half Sleeves Flash Set #3** - Damien Friesz Half Sleeves Flash Set #3
**Damien Friesz Roses Flash Set #1** - Damien Friesz Roses Flash Set #1
**Damien Friesz Bio Mechanical Flash Set #1** - Damien Friesz Bio Mechanical Flash Set #1
**Damien Friesz Asin Skulls Flash Set #1** - Damien Friesz Asin Skulls Flash Set #1
**Damien Friesz Skulls & Asian Flowers Flash Set #1** - Damien Friesz Skulls & Asian Flowers Flash Set #1
**Damien Friesz Skull Flash Set 2006** - Damien Friesz Skull Flash Set 2006

Return To Tattoo Supplies and Equipment by Kingpin Tattoo Supply

MONSTERCOMMERCE™
a NetworkSolutions company
E-commerce powered by MonsterCommerce shopping cart.



*Damien Friesz Roses Flash Set #1*



## Damien Friesz Roses Flash Set #1

**Damien Friesz Roses Flash Set #1 - 5 color sheets w/lines**
Price: $65.00
Buy Product Online | Visit Store
Home

**Other Items from Damien Friesz**

**Damien Friesz Hands Flash Set #1** - Damien Friesz Hands Flash Set #1
**Damien Friesz Hands Flash Set #2** - Damien Friesz Hands Flash Set #2
**Damien Friesz Chest Panels Flash Set #1** - Damien Friesz Chest Panels Flash Set #1
**Damien Friesz Half Sleeves Flash Set #1** - Damien Friesz Half Sleeves Flash Set #1
**Damien Friesz Half Sleeves Flash Set #2** - Damien Friesz Half Sleeves Flash Set #2
**Damien Friesz Half Sleeves Flash Set #3** - Damien Friesz Half Sleeves Flash Set #3
**Damien Friesz Roses Flash Set #1** - Damien Friesz Roses Flash Set #1
**Damien Friesz Bio Mechanical Flash Set #1** - Damien Friesz Bio Mechanical Flash Set #1
**Damien Friesz Asin Skulls Flash Set #1** - Damien Friesz Asin Skulls Flash Set #1
**Damien Friesz Skulls & Asian Flowers Flash Set #1** - Damien Friesz Skulls & Asian Flowers Flash Set #1
**Damien Friesz Skull Flash Set 2006** - Damien Friesz Skull Flash Set 2006

Return To Tattoo Supplies and Equipment by Kingpin Tattoo Supply

MONSTERCOMMERCE
a NetworkSolutions company
E-commerce powered by MonsterCommerce shopping cart software.

EXHIBIT  D

1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   DOCKET NO. 08-cv-5572 LP

3

4   TATTOO JOHNNY, INC.,                  )
                                          )
5                       Plaintiff,        )
                                          )
6       -vs-                              )   DEPOSITION OF:
                                          )
7   CHRISTIAN AUDIGIER, INC., SHOP        )   DAVID BOLLT
    ON STAGE, INC., CHRISTIAN             )
8   AUDIGIER, TY BOWERS, MACY'S           )
    INC., BLOOMINGDALE'S, INC.,           )
9   NORDSTROM, INC., VANGUARD             )
    APPAREL LIMITED, JOHN DOES            )
10  1-100, inclusive,                     )

11                      Defendants.

12

13  _____

14

15          TRANSCRIPT of the stenographic notes of

16  the proceedings in the above-entitled matter, as

17  taken by and before LINDA M. HOFFMANN, a Certified

18  Court Reporter and Notary Public of the State of New

19  Jersey, held at the office of OLENDER FELDMAN, ESQS.,

20  2840 Morris Avenue, Union, New Jersey, on Thursday,

21  July 17, 2008, commencing at 10:15 a.m.

22

23

24

25

2

```
 1  A P P E A R A N C E S:

 2


 3    OLENDER FELDMAN LLP
      BY: JONAS SEIDER, ESQ.
 4        MARK D. MILLER, ESQ.
      2840 Morris Avenue
 5    Union, New Jersey 07083
      Attorneys for Plaintiff

 6

 7    DICKSTEIN SHAPIRO, LLP
      BY: RICHARD LaCAVA, ESQ.
 8        PETER LAMBRIANAKOS, ESQ.
      1177 Avenue of the Americas
 9    New York, New York 10036-2714
      Attorneys for Defendants, Christian
10    Audigier, Inc., Shop On Stage, Inc.,
      Christian Audigier

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                          INDEX
2    WITNESS                    DIRECT
3     DAVID BOLLT
         BY MR. LaCAVA         4
4

5

6                          EXHIBITS
7    NO.   DESCRIPTION                      PAGE
8     Bollt-1        Letter dated June 24, 2008
                     to Judge Preska ............ 7
9     Bollt-2        Copyright Assignment and
                     Work Made For Hire
10                   Agreement between Tattoo
                     Johnny and Andrea Alvarez
11                   and Alejandro Alvarez, 2
                     pages ....................23
12    Bollt-3        Grant of Copyright Rights
                     Agreement between Tattoo
13                   Johnny and Damien Friesz,
                     6 pages, 000013-000018 ......23
14    Bollt-4        Grant of Copyright
                     Agreement between Tattoo
15                   Johnny and Damien Friesz,
                     000033 ....................24
16    Bollt-5        Declaration of David Bollt ..30
      Bollt-6        Terms and Conditions for
17                   use of Tattoo Johnny
                     website, 2 pages ...........32
18    Bollt 7        Form CA's, 000027-000032 ....71
      Bollt 8        2 Web pages ..............102
19    Bollt 9        KingPin Tattoo Supply
                     Damien Friesz Skull Flash
20                   Set 2006, 2 pages, .........105
      Bollt 10       KingPin Tattoo Supply,
21                   Damien Friesz Roses Flash
                     Set # 1, 2 pages ..........107
22

23
                      SPECIAL REQUESTS
24                   PAGE      LINE
25                     64       18
```

4

1   DAVID BOLLT, residing at 110 Winchester Court,

2   Fairburn, Georgia, having been duly sworn by the

3   Notary Public, testified as follows:

4   DIRECT EXAMINATION BY MR. LaCAVA:

5        Q.     Okay.  Just before we start, Mr. Bollt,

6   I just want to give you some basic deposition rules

7   we'll go by.  Have you ever been deposed before?

8        A.     Never.

9        Q.     Okay.  From time to time, you can take

10  breaks if you would like to, get some water,

11  bathroom, whatever you need.  I would ask that just

12  before you take a break, if there's an open question

13  on the table, you answer the question first and then

14  we can take a break.  Is that okay?

15       A.     Um-hum.

16       Q.     Also, I think, for the purpose of the

17  court reporter, when answering, I think you have to

18  answer yes and no, and not just either nod or say

19  "um-hum" or something like that.

20       A.     Okay.

21       Q.     Okay.  Thank you.

22              If I ever ask you a question that you

23  don't understand, please let me know and I will try

24  and rephrase or clarify it for you.  If not, I'm

25  going to assume that you understand the question.

Bollt - direct

30

1   artwork, we do represent more than 200 artists.

2        Q.     Okay.  When I say Tattoo Johnny artwork,

3   I mean artwork that Tattoo Johnny owns.

4        A.     They, for the most part, include artwork

5   that Tattoo Johnny owns, and there are other artists

6   that are included that earn a royalty, or have

7   received a flat fee for their inclusion in the

8   product.

9        Q.     I'm handing you now, this will be

10  Exhibit 5.  It's titled Declaration of David Bollt.

11             (Exhibit Bollt-5, Declaration of David

12  Bollt was received and marked for identification.)

13       Q.     Have you ever seen this document before?

14       A.     I'm not sure.

15       Q.     You're not sure?  Is that your name on

16  the first page?

17       A.     Oh, there we go.  It is.

18       Q.     Okay.  I'll ask you, have you seen this

19  document before?

20       A.     I believe so.

21       Q.     On the seventh page.

22       A.     There we go.

23       Q.     Okay.  Is that your signature?

24       A.     Yes.

25       Q.     Okay.  And is everything in this

Bollt - direct

31

1  Declaration true?

2       A.      I believe so.

3       Q.      Yes or no?

4       A.      Yes.

5       Q.      Okay.  I'm going to ask you to turn to

6  Paragraph 5.  It's on the second page.  If you could

7  please take a look at that paragraph.

8       A.      Um-hum.

9       Q.      Okay.  This paragraph talks about the

10 Terms and Conditions found on the Tattoo Johnny

11 website.  Is that correct?

12      A.      Um-hum.

13      Q.      Are you familiar with those Terms and

14 Conditions?

15      A.      Not closely, no.  I know that they

16 exist, and I know that they're there to discourage

17 copyright infringement.

18      Q.      Are you familiar with the exact words

19 that are here in Paragraph 5 --

20      A.      No.

21      Q.      -- in the Terms and Conditions?

22      A.      No.  Exact words that appear in

23 Paragraph 5?  I could read Paragraph 5.

24      Q.      Read it, please.

25      A.      Okay.  I've read Paragraph 5.

Bollt - direct

32

1          Q.      Okay. Are those the words that appear
2    in the Terms and Conditions?
3          A.      I don't know.
4          Q.      Have you ever seen the Terms and
5    Conditions?
6          A.      I have seen the Terms and Conditions.
7          Q.      You have seen the Terms and Conditions?
8                  Okay.  Let's mark Exhibit 6.  This is a
9    print-out from the Tattoo Johnny website.  It's
10   titled Terms and Conditions for use of Tattoo Johnny
11   website.
12                 (Exhibit Bollt-6, Terms and Conditions
13   for use of Tattoo Johnny website, 2 pages was
14   received and marked for identification.)
15         Q.      Have you ever seen this document before?
16         A.      Yes.
17         Q.      So you are familiar with the terms that
18   are here?
19         A.      I am not specifically familiar with the
20   legal details.  Again, I know that the Terms and
21   Conditions exist, and I've seen it, and I know why
22   they exist.
23         Q.      Do you have -- do you know -- of
24   Exhibit 6 here, do you know if these are the Terms
25   and Conditions that were in place when the defendants

33

1  allegedly downloaded from the Tattoo Johnny website?

2      A.    I have no reason to think that they

3  wouldn't be.

4      Q.    Okay.  Does Tattoo Johnny ever change

5  its Terms and Conditions?

6          MR. MILLER:  I'm going to object to the

7  form of the question.

8      Q.    Strike that.

9          Has Tattoo Johnny ever changed its Terms

10 and Conditions on its website?

11     A.    Has it ever?

12     Q.    Yes.

13         MR. MILLER:  I'm going to object to the

14 form of the question.  What Terms and Conditions

15 specifically are you asking about?

16         MR. LaCAVA:  The ones in the document

17 I've handed to the witness.

18         MR. MILLER:  Are you asking about the

19 first section, the second section, the third section?

20         MR. LaCAVA:  All of them.

21         MR. MILLER:  Has he ever changed any of

22 these terms in the website, in the entire time the

23 website has been up.  Is that the question?

24         MR. LaCAVA:  That's the question.

25         MR. MILLER:  All right.

Bollt - direct

44

1   business very well.   He's highly creative, and Damien

2   follows his own artistic impulses and always

3   impresses us, so we haven't had to, or wanted to,

4   impose any specific requirements on him, except to

5   occasionally suggest to him subject matter that our

6   customers would find desirable.

7        Q.      Okay.  How does Tattoo Johnny know that

8   the designs that are submitted by any artist are

9   original?

10       A.      Well, you know, we -- we don't always

11  know that.  And we have on occasion not worked with

12  artists who have submitted work that we thought was

13  questionable.  But of the artists we work with, we

14  have a lot of faith that it's all original content.

15  We know the tattoo industry very well.  We know what

16  everybody's producing across the board, and you know,

17  we also keep an eye on other popular culture, so we

18  see what comes through.  And if anything ever looks

19  questionable, the artist we won't work with.

20       Q.      Does Tattoo Johnny review designs before

21  they're actually uploaded?

22       A.      Yes.

23       Q.      Okay.  And can you describe for me a

24  little more that review process?

25       A.      Yeah.  You know, the designs all have to

45

1  be keyworded for search.  And this is when they're --

2  you know, sort of the last step of quality control to

3  make sure the line art looks good, and to make sure

4  even the files upload into the system properly so

5  that the customer isn't going to get some buggy JPEG,

6  that they get a clean usable English file, and they

7  get tagged with keywords and approved for download.

8      Q.    When they're approved for download, you

9  said sometimes you look for questionable designs?

10     A.    Not so much in that process.  When

11 artists submit their work to us, you know, we're

12 looking for unique talent.  We're looking for artists

13 that bring something special to the table, and so we

14 receive far more submissions than we could ever put

15 in the website, and so we are sifting through what

16 comes in, looking for people who have their own

17 natural ability to generate original content.  Those

18 are the only people we have any interest in working

19 with.  So if somebody appears to be submitting

20 designs that are not -- that are not original, or if

21 they're derivative, then we're not really interested.

22 Those aren't the people we work with.  We basically

23 kind of like to believe we represent the cream of the

24 crop out there.

25     Q.    How would you know that any particular

Bollt - direct

46

1  design was not original or derivative?

2        A.      Well, it's certainly possible that a

3  specific design could slip through.  We've certainly

4  stopped -- not all the artists understand, so we have

5  had an artist submit artwork that maybe he did a

6  Superman logo, because, you know, in his tattoo

7  studio, he might tattoo that on somebody.  That's not

8  our concern.  But when it comes in to Tattoo Johnny,

9  if we see anything like that, we explain to them why

10  we can't use that.

11        Q.      Okay.  Has Tattoo Johnny ever received

12  any complaint from any artist that a piece of artwork

13  available, or a tattoo design available has been

14  copied from them?

15        A.      No.

16        Q.      Other than the documents that you

17  provided to us, that Tattoo Johnny provided to

18  defendants, do you have any other records that

19  indicate the efforts that we're going through to

20  develop these designs?

21        A.      Not other than what was provided, no.

22        Q.      Okay.  Let's turn back to the eagle

23  here.

24              You said that this was designed by

25  Andrea and Ale.  Is that correct?

50

1   that's in Exhibit E of your Declaration?

2       A.    I don't know.  This image has appeared

3   in many forms, so I don't know.

4       Q.    Can you describe for me what you mean by

5   "this image has appeared in many forms"?

6       A.    Well, it sells in print to tattoo

7   studios, in which case, at the bottom of the page

8   would say something to the effect of "Copyright,

9   Tattoo Johnny," the URL, and the year.

10          And something very similar, but not

11  identical, would appear on the downloaded version --

12      Q.    Okay.

13      A.    -- of the image.  But when we use it in

14  other licensing, it's not always practical to affix a

15  copyright notice to certain forms.  So...

16      Q.    And following up with that, how do you

17  use this image in other licensing?

18      A.    This is a popular image, so it's been

19  used in other licenses of ours.

20      Q.    Can you describe for me specifically

21  what those licenses are?

22      A.    Off the top of my head, cell phone menu

23  interface.

24      Q.    Okay.

25      A.    There's something called an iPod pin.

53

1    know if there's another name for the company.

2         Q.     Okay.  Was that a royalty arrangement,

3    as well?

4         A.     It's a royalty arrangement, but I don't

5    know if this has been produced as an item.

6         Q.     Okay.  Do you know what the royalty rate

7    might have been in that agreement?

8         A.     No.

9         Q.     Did you negotiate that agreement?

10        A.     I probably had a hand in it.

11        Q.     To the best of your knowledge, has it

12   been signed?

13        A.     Yes.

14        Q.     To the best of your knowledge, has the

15   cell phone agreement been signed, as well?

16        A.     Yes.

17        Q.     Are there any other licensing agreements

18   that you know of that relate to the eagle design?

19        A.     I'm not sure if the eagle appears on the

20   guitar straps, but it likely could.

21        Q.     Okay.  Any others?

22        A.     I can't say, off the top of my head.

23        Q.     Okay.

24               Back to the Exhibit E in the eagle

25   design, and the copyright notice at the bottom of the

67

1   when I contacted Ty Bowers.  And so this is -- this

2   is a unique instance.

3         Q.     Does Tattoo Johnny have any other

4   registered copyrights?

5         A.     I don't know.

6         Q.     Okay.  Who would know?

7         A.     I don't know.

8         Q.     Before Tattoo Johnny would decide to

9   file a copyright application, would they do any

10  research to see what any prior designs existed?

11        A.     What do you mean?

12        Q.     Just to know what else is out there.

13        A.     I'm still not sure what you mean.

14        Q.     Okay.  We'll strike the last question.

15               Before Tattoo Johnny would decide to

16  file a copyright application, would they do any

17  research to make sure that the work or the design

18  that they're filing for protection was original?

19        A.     When you say "was original," I'm not

20  sure what you mean.

21        Q.     Wasn't copied from someone else.

22        A.     That's part of the screening process

23  with our artists.

24        Q.     Okay.

25        A.     You know, again, I don't know how to

68

1  emphasize that, you know, our artists -- the tattoo

2  industry is a very competitive place, and these

3  artists are all trying to make a name for themselves

4  based on their unique approach for generating images.

5  This is why we select these people to work with and

6  represent them.

7           And so these are guys who, you know, I

8  mean, you know, I don't even know how many skulls or

9  butterflies we have in the collection, but they're

10 all distinct, and this is why, you know, we have such

11 a large collection available, it's because every

12 customer is looking for a different image.

13      Q.     So taking, for example, the eagle, so

14 there was no specific research that was done to make

15 sure that that work was original.

16      A.     You know, again, that was part of the

17 screening process with the artists.  What we found

18 was that we had some very talented, highly creative

19 artists that were generating unique content from

20 their own artistic inspiration.  And so the research

21 was done when we selected them to draw for us.

22      Q.     Okay.  So just to clarify, after the

23 designs were submitted, the design for the eagle was

24 submitted, there was no further checking?

25           MR. SEIDER:  I have an objection to

Bollt - direct

69

1  form.  Are you asking just on his behalf?

2      Q.     Tattoo Johnny's behalf.  Does the

3  company check?

4      A.     You know, as I said before, you know,

5  any designs or artists that seem like they're engaged

6  in questionable practices --

7      Q.     Specifically for the eagle, specifically

8  for the eagle.

9      A.     No.

10     Q.     Okay.

11     A.     It was -- it really seemed like a

12 special example of an eagle.

13     Q.     Okay.  How about for the skull?  After

14 it was submitted, was there any check done to see if

15 it was copied from anywhere?

16     A.     No.  Damien's a proud and fiercely

17 independent artist.

18     Q.     How about for the rose and the knife?

19     A.     Same.

20     Q.     Same because that's Damien's work?

21     A.     Yeah.  And like with a lot of our

22 artists, these are guys who, you know, they --

23 they're not getting where they're going by copying.

24     Q.     Okay.

25     A.     You know, there's a lot of tattoo

76

1       A.     I suppose it's possible.

2       Q.     Okay.  Did anyone at Tattoo Johnny

3 contact the artist to ask them what the correct date

4 of first publication was?

5       A.     I don't know that the artist would know.

6       Q.     The artist would not know the date that

7 they first published their work?

8       A.     The date we published their work?

9       MR. SEIDER:  Objection to form.

10      Q.     Okay.

11      MR. SEIDER:  You're assuming that the

12 artist published the work prior to submitting it to

13 Tattoo Johnny for publication.

14      MR. LaCAVA:  Understood.  I will

15 clarify.

16      Q.     Do you know if any of the artists

17 published their work before submitting it to Tattoo

18 Johnny?

19      A.     I don't know.

20      Q.     Did you bother to check before filing

21 copyright registrations?

22      A.     No.

23      Q.     Okay.  Of any of the three designs, the

24 eagle, the skull with the rose on top, and the knife

25 and rose, has Tattoo Johnny licensed any of the

78

1   tattoo, I would imagine so.

2        Q.    Okay.  How about to anyone -- strike

3   that.

4              Has Tattoo Johnny licensed any of the

5   copyrights in suit for use on T-shirts?

6        A.    You know, that's a bit of a debate.  The

7   eagle is certainly an image we had every intention of

8   using on T-shirts.  And we don't want to be accused

9   of plagiarism, so I'm not sure what's going to happen

10  with that.

11       Q.    Can you describe for me what you meant

12  by you intended on using?  You intended on using the

13  eagle on T-shirts?

14       A.    Absolutely.  It's perfect for T-shirts.

15       Q.    Okay.  Did you actually have any license

16  agreements with any entity for placing the eagle on a

17  T-shirt?

18       A.    We art direct a lot of our licenses, so

19  they don't necessarily come in with specific requests

20  for specific work.  People look to Tattoo Johnny if

21  they're going to do a line of T-shirts to art direct

22  the line of T-shirts, because we know our inventory

23  and we know our artists, and we know what sells.  So

24  with a T-shirt license, for example, we're going to

25  go through our artwork and hand pick our favorite

Bollt - direct

79

1  artists and our favorite images to bring to the
2  market.  Certainly that eagle was on the list.
3      Q.    Okay.  Has Tattoo Johnny entered into
4  any agreement with any -- with anyone to place images
5  on T-shirts, any of the Tattoo Johnny designs?
6      A.    We have a T-shirt license.
7      Q.    Okay.  Who is that with?
8      A.    BZT's.
9      Q.    Where is BZT's located?
10     A.    San Diego.
11     Q.    Is BZT's affiliated with Tattoo Johnny
12 at all?
13     A.    Affiliated?
14     Q.    Does anyone who has an interest in
15 Tattoo Johnny operate or own an interest or anything
16 like that in BZT's?
17     A.    It's a licensing agreement.
18     Q.    I'm sorry.  The company, BZT's, does
19 anyone, any employee or owner of Tattoo Johnny own an
20 interest in BZT's?
21     A.    No.
22     Q.    They're a separate entity?
23     A.    Um-hum, yes.
24     Q.    Can you explain to me the terms of that
25 licensing agreement with BZT's?

80

```
 1        A.      I don't know all the details.  It's a
 2   royalty agreement.  Again, as far as what we're to
 3   bring to the table is our very best designs.
 4        Q.      Is it an exclusive agreement with BZT's?
 5        A.      Exclusive?
 6        Q.      As in you, Tattoo Johnny's, will not
 7   license another T-shirt manufacturer?
 8        A.      Correct.
 9        Q.      It is exclusive?
10        A.      It is exclusive.
11                MR. LaCAVA:  Counsel, I would like a
12   copy of that agreement.
13        Q.      Do you know if BZT's has given any
14   rights of enforcement in that --
15        A.      I don't know.
16        Q.      Does the license with BZT's mention
17   specific Tattoo Johnny designs?
18        A.      No.
19        Q.      When was that license agreement entered
20   into?
21        A.      I don't know.
22        Q.      Was it entered into in 2007?
23        A.      I'm not sure.
24        Q.      2008?
25        A.      It's either 2007 or 2008.
```

Bollt - direct

92

1    Q.    No.  Was it a very short conversation?

2    A.    It was fairly short.  It was right to

3    the point.

4    Q.    Okay.  If you would turn to paragraph 11

5    of your Declaration.  It says -- can you read that

6    paragraph just for a second.  To yourself is fine.

7    A.    Okay.

8          Okay.

9    Q.    So you had spoken to Mr. Bowers

10   sometimes shortly after December 11 of 2007.

11   A.    I'm fairly confident that it was within

12   two weeks.

13   Q.    Okay.  Fine.

14         Why, in May of 2008, were you reviewing

15   Christian Audigier, Inc.'s website?

16   A.    We are doing design for all manner of

17   product, and even prior to the BZT's deal being

18   signed, we'd been pitching apparel designs.  We have

19   a clothing designer that we're trying to work with to

20   do an apparel line.  And so I'm looking all over.

21   We're looking all over the internet for inspiration

22   and examples of all kinds of design.  We've looked at

23   our competitors' website.  We looked at surfboard

24   websites.  We look at, you know, in all manner of

25   product that tattoo design can go on.

93

1          We often mock up samples of, say, we
2    have a stationery company we want to work with and
3    they seemed a little nervous about tattoo design.
4    Maybe it -- you know, some people still carry the
5    stigma.  And so we just mocked up samples of like 20
6    different stationery notebooks for them to see how it
7    could be.  And this was purely speculative mock-ups.
8          And we'll do the same thing with
9    surfboards and we'll do the same thing with musical
10   equipment.  This is what we do.  So yeah, we have
11   mock-ups for apparel, as well as we research what's
12   out there.  We research what's popular.
13         Looking at Don Ed Hardy and Christian
14   Audigier, you know, when it's our intention to go
15   into the apparel business, it's sort of a natural
16   thing for us to do.
17         Q.     Okay.  You mentioned a clothing
18   designer.  Which clothing designer are you trying to
19   work with?
20         A.     My good friend, Joe Faris.
21         Q.     Is there a name to the clothing line?
22         A.     Joe had done a line of tattoo clothing
23   years ago, and 9/11 happened, but he always has felt
24   there's tremendous potential, that tattoo is sort of
25   a new sector in fashion.  Kind of like urban street

94

1  wear was considered a fad, it's now its own sector.

2  And he thinks that tattoo-related clothing has that

3  same potential.

4           And so we've been talking to Joe for a

5  long time about doing an apparel line where Joe can

6  act as a clothing designer and I can work as the art

7  director and graphic designer, and that together we

8  can make some really exciting product.

9      Q.     Is Joe located in New York?

10     A.     I'm not sure where Joe is.  You'll catch

11 him on Project Runway this season.

12     Q.     Did you do -- from the time you spoke

13 with Mr. Bowers, did you do regular reviews of the

14 Christian Audigier website?

15     A.     No, we assumed it was a closed matter.

16     Q.     Okay.  Can you read paragraph 12 of your

17 Declaration for me?

18     A.     Okay.

19     Q.     Okay?  If I just heard you correctly,

20 you said after you spoke with Mr. Bowers, you didn't

21 have any reason to monitor the website.  But here in

22 paragraph 12, it says, "Defendants CAI, Shop on

23 Stage, Inc., and Christian Audigier are affiliated

24 with the Don Ed Hardy brand which gave me reason to

25 monitor the CAI website for any possible

95

1  infringement."

2          Would you like to clarify that?

3      A.    Yeah.  You know, as I stated, we are

4  involved in design.  I read over this very carefully

5  as it was prepared by counsel, and -- and I -- you

6  know, I'm sorry to see that there's a discrepancy.

7      Q.    Okay.  Turn to Exhibit D of your

8  Declaration for me.  Take a look at that for a

9  second.

10     A.    Um-hum.

11     Q.    Do you know who prepared these

12 screenshots in Exhibit D of your Declaration?

13     A.    I don't know.

14     Q.    Okay.  Do you know when they were taken?

15     A.    I don't know.

16     Q.    Okay.  And are these the same

17 screenshots you're referring to in paragraph 12 of

18 your Declaration?

19     A.    Yes.

20     Q.    Okay.  Taking a look at your Declaration

21 again, the last sentence in paragraphs 11 and 12 are

22 almost, if not exactly, identical.

23     A.    Um-hum.

24     Q.    Is that correct?

25     A.    Yes.

Bollt - direct

97

```
 1        Q.      Okay.  Who made the decision to send a
 2   cease and desist letter to defendants?
 3        A.      It was a mutual decision.
 4        Q.      Of whom?
 5        A.      Myself, my business partner, and
 6   counsel.
 7        Q.      Is Exhibit F to your Declaration that
 8   cease and desist letter?
 9        A.      It would appear to be.
10        Q.      Okay.  Have you ever seen this letter
11   before?
12        A.      I believe so.
13        Q.      In what form have you ever seen this
14   letter?
15        A.      In what form?
16        Q.      Scratch that.
17                Did you ever review a draft of this
18   before it was sent to defendants?
19        A.      I believe so.
20        Q.      Okay.  Have you ever seen defendants'
21   allegedly infringing products?
22        A.      Yes.
23        Q.      Where?
24        A.      I was in New York recently for the
25   licensing show, the global licensing show, and
```

Bollt - direct

98

1   counsel had purchased one of the shirts from one of

2   the stores so we could actually get a look at it.  It

3   was the eagle.  It was -- it was remarkable.

4          Q.     Okay.  When were you in New York for

5   that show?

6          A.     I'm not sure of the dates of the

7   licensing show.  It was recently.

8          Q.     "Recently," as in the last couple

9   months?

10         A.     Yeah.

11         Q.     Okay.  If you look at Exhibit G of your

12  Declaration.

13         A.     Um-hum.

14         Q.     Can you explain to me who took these

15  pictures?

16         A.     Counsel.

17         Q.     Counsel.  Do you know when?

18         A.     I believe it was shortly after -- it was

19  shortly after the licensing show, I believe.  It was

20  fairly recently.  We had heard that our designs were

21  sort of being featured as some of the flagship images

22  of the new Christian Audigier line.  So when I heard

23  that they were in the window, we thought it would be

24  a good idea to take pictures.

25         Q.     So was it you who directed counsel to

102

1   step was to really get involved in licensing; so not

2   this licensing show but the one previous we went out

3   to the global licensing show and got involved in the

4   licensing business.

5       Q.    Okay.  So of the copyright, or of the

6   copyrighted designs that are at issue in this

7   litigation, do you know of any other person who's

8   claiming any rights in those copyrighted designs?

9       A.    No.

10      Q.    So it's your testimony that the artists

11  who assigned the copyrights to Tattoo Johnny no

12  longer own the copyrights in that work?

13      A.    That's my understanding.

14      Q.    Okay.

15            (Exhibit Bollt 8, 2 Web pages were

16  received and marked for identification.)

17            MR. LaCAVA:  What I've just handed to

18  the witness is a printout that's found on the

19  internet of a screenshot of vosstattoos.com website.

20  Are you aware of this website?

21      A.    Not specifically.  Is this Damien's

22  website?  I'm not supposed to ask the question.

23      Q.    I'm going to ask you, do you believe

24  this is Damien Friesz's website?

25      A.    It likely could be.  I don't know

Bollt - direct

103

1    specifically.

2         Q.    Are you familiar at all with this

3    website?

4         A.    No.

5         Q.    Okay.  If you can, can you read for me

6    the printing in the left-hand corner of the

7    screenshot?  It sort of goes vertical.  Can you read

8    it out loud?

9         A.    Out loud now?

10        Q.    Yes, please.

11        A.    Okay.  It looks like a copyright notice,

12   "2006-2006 Damien Friesz."

13        Q.    Okay.  Do you know why if -- sorry,

14   scratch that.

15             Can you look at the -- there are six

16   panels, five of them have tattoo designs.

17        A.    Um-hum.

18        Q.    Okay?  The middle panel top, can you --

19   does that skull that's there appear to be the same

20   skull that's the subject of your copyright

21   registration?

22        A.    It appears to be, yes.

23        Q.    Do you know why Damien Friesz would

24   continue to put his copyright notice in relation to

25   this drawing?

Bollt - direct

104

```
 1        A.      As opposed to?

 2        Q.      As opposed to Tattoo Johnny's copyright

 3   notice?

 4        A.      You know, I think in general artists

 5   sign their work and put down copyright notices just

 6   to alert the public that there's a protection in

 7   place.

 8        Q.      Could you turn to the second page of

 9   this.  It says at the top

10   "vosstattoos.com/artwork/52120.html."

11        A.      Yes.

12        Q.      Have you ever seen this website before?

13        A.      No.

14        Q.      Can you read for me what the wording is

15   on the bottom left-hand corner?

16        A.      It appears to be "Copyright 2006," and

17   then I don't know.  It looks like "2888" to me,

18   "Damien Friesz."  But obviously there's a date range

19   and a copyright notice with his name.

20        Q.      Okay.  And again, in the middle panel at

21   the top, does that appear to be the --

22        A.      Yes.

23        Q.      -- the knife and rose design --

24        A.      Yes, it does.

25        Q.      -- that's at issue in this litigation?
```

105

1      A.      Yes.

2      Q.      Okay.

3              (Exhibit Bollt 9, KingPin Tattoo Supply

4   Damien Friesz Skull Flash Set 2006, 2 pages, was

5   received and marked for identification.)

6      Q.      I'm handing you Exhibit 9.  Exhibit 9 is

7   a screenshot print-out from KingPin Tattoo Supply.

8   And it says, "Damien Friesz Skull Flash Set 2006."

9   Have you ever seen this website before?

10     A.      No.

11     Q.      Is Tattoo Johnny at all associated with

12  KingPin Tattoo Supply?

13     A.      No.

14     Q.      Do you know who KingPin Tattoo Supply

15  is?

16     A.      I recognize the company name from the

17  tattoo circuit, but I am not -- I don't know these

18  people.

19     Q.      Okay.  Do you see the five panels of

20  tattoo designs that are on this front page?

21     A.      Yes.

22     Q.      In the bottom right-hand corner, do you

23  see the panel that's there that's partially covered

24  by the top panel?

25     A.      Yes.

106

1      Q.     Okay.  The skull that's in the middle

2  there, does that appear, from what you can make of

3  the image, to be the skull design?

4      A.     It appears to be, yes.

5      Q.     Okay.  Did Tattoo Johnny give KingPin

6  Tattoo Supply a license to sell these designs?

7      A.     No.

8      Q.     Did Tattoo Johnny give a license to

9  Damien Friesz to sell these designs?

10     A.     Give Damien Friesz a license?  With

11  almost all of our artists, we do have an

12  understanding that they're allowed to sell their own

13  work.

14     Q.     Would that be written at all in the

15  assignment agreement with Damien Friesz?

16     A.     No.

17     Q.     It's a verbal understanding?

18     A.     Yeah.

19     Q.     This website seems to indicate that this

20  skull flash set was available in 2006.  Do you have

21  any reason to believe that that is incorrect?

22     A.     No.

23     Q.     Is it possible that Damien Friesz

24  created this skull design in 2006 and has been

25  selling it since then?

107

1          A.      Certainly.

2          Q.      Okay.

3                  (Exhibit Bollt 10, KingPin Tattoo

4     Supply, Damien Friesz Roses Flash Set # 1, 2 pages

5     was received and marked for identification.)

6          Q.      This is another printout, screenshot

7     from KingPin Tattoo Supply.  And it's titled "Damien

8     Friesz Roses Flash Set Number 1."

9                  Have you ever seen this website before?

10         A.      No.

11         Q.      Did -- if you look at the five panels of

12    tattoo designs that are here, the bottom left-hand

13    corner, does the center design appear to be the knife

14    and rose design that's the subject of this

15    litigation?

16         A.      Yes, it does.

17         Q.      Did Tattoo Johnny give KingPin Tattoo

18    Supply a license to sell this design?

19         A.      No.

20         Q.      Did Tattoo Johnny give Damien Friesz a

21    license to sell this design?

22         A.      We have a verbal understanding with most

23    of our artists that they have the right to continue

24    selling their own work.

25         Q.      Okay.  To the best of your knowledge,

108

1  has there ever been a tattoo artist that has drawn an

2  eagle?

3        A.     Yes.

4        Q.     Have there been many variations of

5  eagles?

6        A.     Yes.

7        Q.     About how many, would you guess?

8        A.     I would guess -- you know, I'm not going

9  to put a number on that.  You know, it's kind of like

10 snowflakes, the way each one is distinct and unique

11 no matter how many fall from the sky.  It's a little

12 like that.

13       Q.     Okay.  To the best of your knowledge,

14 has there ever been a tattoo artist that has drawn a

15 skull?

16       A.     Yes.

17       Q.     To the best of your knowledge, has there

18 ever been a tattoo artist that has drawn a skull with

19 a rose on it?

20       A.     I would suspect that that's probably

21 likely.

22       Q.     To the best of your knowledge, has there

23 ever been a tattoo artist that has drawn a flower

24 with a knife through it?

25       A.     Yes.

109

1     Q.    To the best of your knowledge, has there

2  ever been a tattoo artist that has drawn a rose with

3  a knife through it?

4     A.    That's likely.

5     Q.    To the best of your knowledge, do you

6  know if any such designs exist, other than the ones

7  that are subject to this litigation?  The rose and

8  knife.

9     A.    Not, specifically but it seems like

10  something that probably exists.  And there's

11  obviously demand for it to exist in multiple unique

12  forms, or else we would have no business bringing it

13  to market.

14         MR. LaCAVA:  Can we take a five-minute

15  break off the record, and then I'll see if I have

16  anything else for you.

17         (A recess is taken.)

18     Q.    I'm finished questioning the witness and

19  ask counsel if they have any questions they would

20  like to follow up with.

21         MR. SEIDER:  I have no follow-up

22  questions.

23         MR. LaCAVA:  So we are complete.

24         (The proceedings concluded at 1:12 p.m.)

25

EXHIBIT  E

**TERMS AND CONDITIONS FOR USE OF TATTOO JOHNNY WEBSITE**

Welcome to the Tattoo Johnny, Inc. website. Below are the terms and conditions that govern your use of this site.

THESE TERMS AND CONDITIONS OF USE CONSTITUTE A LEGAL AGREEMENT BETWEEN YOU AND TATTOO JOHNNY, INC. ("TATTOO JOHNNY," "WE" OR "OUR"). PLEASE READ THIS AGREEMENT ("AGREEMENT") IN ITS ENTIRETY BEFORE YOU CONTINUE TO USE THIS WEBSITE OR DOWNLOAD ANY IMAGE.

**Copyrights**

Any purchase of a tattoo design from Tattoo Johnny grants the purchaser the right to reproduce the design for their personal tattoo only. Any other reproduction is strictly prohibited. All designs and images by Tattoo Johnny artists are protected by state and federal copyright laws. No one may copy, sell, distribute, and/or in any way make use of the images and designs by any of these artists without the express written consent of Tattoo Johnny, Inc. Anyone who violates any of the exclusive rights of the copyright owner and/or licensed agent shall be criminally prosecuted under section 2319 of title 18, United States Code, including imprisonment for up to 5 years for the first offense and civil and criminal penalties of up to $150,00.00 per violation.

**Ownership of This Website**

This website is owned and operated by Tattoo Johnny. All of the Content featured or displayed on this website, including, but not limited to, text, graphics, photographs, moving images, sound, illustrations and software ("Content"), is owned by Tattoo Johnny, its licensors and its Content providers.

All elements of Tattoo Johnny's websites, including, but not limited to, the general design and the Content, are protected by trade dress, copyright, moral rights, trademark and other laws relating to intellectual property rights. Except as explicitly permitted under this or any other agreement with Tattoo Johnny or one of its subsidiaries, no portion or element of this website or its Content may be copied or re-transmitted via any means, and this website, its Content and all related rights shall remain the exclusive property of Tattoo Johnny or its licensors, unless otherwise expressly agreed. You shall indemnify Tattoo Johnny, its subsidiaries, affiliates and licensors against any losses, expenses, costs, damages or legal fees incurred by any or all of them as a result of your breach of the terms of this Agreement or your unauthorized use of the Content and related rights.

**Disclaimers**

THIS WEBSITE AND ITS Content ARE PROVIDED "AS IS" AND TATTOO JOHNNY EXCLUDES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY OR FITNESS FOR A PARTICULAR PURPOSE. TATTOO JOHNNY WILL NOT BE LIABLE FOR ANY DAMAGES OF ANY KIND ARISING FROM THE USE OF THIS SITE, INCLUDING, BUT NOT LIMITED TO, DIRECT, INDIRECT, INCIDENTAL, PUNITIVE AND CONSEQUENTIAL DAMAGES. THE FUNCTIONS EMBODIED ON, OR IN THE MATERIALS OF THIS WEBSITE ARE NOT WARRANTED TO BE UNINTERRUPTED OR WITHOUT ERROR. YOU, NOT TATTOO JOHNNY, ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION DUE TO YOUR USE OF THIS WEBSITE. TATTOO JOHNNY DOES NOT GUARANTEE THE QUALITY OF YOUR TATTOO. YOU, NOT TATTOO JOHNNY, ASSUME FULL RESPONSIBILITY FOR YOUR CHOICE TO GET A TATTOO; YOUR CHOICE OF DESIGN AND YOUR CHOICE OF TATTOOIST.

Except as specifically stated in these Terms and Conditions of Use or elsewhere on this website, or as otherwise required by applicable law, neither Tattoo Johnny nor its directors, employees, licensors, Content providers, affiliates or other representatives shall be liable for damages of any kind (including, without limitation, lost profits, direct, indirect, compensatory, consequential, exemplary, special, incidental, or punitive damages) arising out of your use of, your inability to use, or the performance of this website or the Content, whether or not we have been advised of the possibility of such damages.

Tattoo Johnny uses reasonable efforts to ensure the accuracy, correctness and reliability of the Content, but we make no representations or warranties as to the Content's accuracy, correctness or reliability.

There may be links to other websites from the Tattoo Johnny website, however, these other websites are not controlled by Tattoo Johnny and we are not responsible for any Content contained on any such website, or any loss suffered by you in relation to your use of such websites. You waive any and all claims against Tattoo Johnny regarding the inclusion of links to outside websites or your use of those websites. Additionally, parties other than Tattoo Johnny provide services from this website. Tattoo Johnny does not evaluate or warrant the offerings or services of these parties, and does not assume any liability for the actions, product, services, or Content of these parties.

Some US states and foreign countries do not permit the exclusion or limitation of implied warranties or liability for

certain categories of damages. Therefore, some or all of the limitations above may not apply to you to the extent they are prohibited or superseded by state or national provisions.

**Governing Law and Venue**

This Agreement shall be interpreted, construed and governed by the laws of the State of New Jersey, USA, without reference to its laws relating to conflicts of law and not including the provisions of the 1980 United Nations Convention on Contracts for the International Sale of Goods. Venue for all disputes arising under this Agreement shall lie exclusively in the Superior Courts of the State of NJ. Users of this website agree that any and all disputes arising from the use of this website, or the ordering of materials from this website, shall be settled by binding arbitration. Notwithstanding the foregoing, Tattoo Johnny shall have the right to commence and prosecute any legal or equitable action or proceeding before any non-US court of competent jurisdiction to obtain injunctive or other relief in the event that, in the opinion of Tattoo Johnny, such action is necessary or desirable.

**No Waiver, Severability of Terms and Clauses**

No action of Tattoo Johnny, other than an express written waiver or amendment, may be construed as a waiver or amendment of any of these Terms and Conditions of Use. Should any clause of these Terms and Conditions of Use be found unenforceable, wherever possible this will not affect any other clause and each will remain in full force and effect.

We reserve the right to change these Terms and Conditions of Use, prices, information and available contractual license terms featured on this website without prior notice. These conditions set forth the entire agreement between Tattoo Johnny and you relating to your use of this website.

**Tattoo Test Drive Disclaimer**

Do not use Tattoo Test Paper if you are pregnant or nursing a baby because of chemicals in the adhesive and possible migration of chemicals from the copiers or printer ink into your body. Some individuals can develop skin allergic reactions even when using medical grade glue. You must assume all responsibility for the safe use of this adhesive and this paper. Do not use in high speed industrial type copiers or printers. Even though this product has been tested on most late model ink-jet and laser printers, the user must determine the compatibility of this paper with his/her own equipment. In some cases if the paper jams and stays in contact with the hot fusing roll in copiers and laser printers damage can occur. In case of paper jam, remove paper immediately. Do not attempt to reuse this product. Do not attempt to print on pages that have already been cut or have holes in them. This can cause a paper jam and may possibly damage your equipment. You must assume all responsibility for any damage to your equipment.

**Returns and Exchanges**

Electronically downloaded tattoo designs and stencils are non-refundable. Tattoo Johnny® will accept returns on Temporary Tattoo Paper and Healing Solution (that has not been or used or damaged) within 30 days of purchase. Tattoo Johnny® will not accept returns for any flash collections, flash sets, or individual flash sheets that have been opened. Tattoo Johnny® will exchange any items that have been damaged during shipping within 30 days of purchase (buyer is responsible for return shipping). Shipping and handling charges are non-refundable, except in the case of a manufacturer's defect. If there is a problem with your order, please call our Customer Service Hotline at 404-592-2901 or contact us.

**Customer Service**

Our customer service office is open from 9AM - 5PM, Monday Thru Friday, Eastern Standard Time. Should you have any questions regarding your merchandise order, please call us at 404-592-2901 or contact us.

If you have any questions regarding your digital download order, please see our FAQ's and contact us through our online forms. A representative will contact you via e-mail or phone. Do not call the Order Center for technical help with the website.

© 2000-2008 Tattoo Johnny, Inc. All rights reserved. Terms and Conditions of Use.



EXHIBIT  F

## LaCava, Richard

| | |
|---|---|
| **From:** | Jonas Seider [jseider@olenderfeldman.com] |
| **Sent:** | Monday, July 21, 2008 10:34 AM |
| **To:** | LaCava, Richard |
| **Cc:** | Mark Miller |
| **Subject:** | RE: Tattoo Johnny |
| **Attachments:** | Tattoo Johnny - Audigier - T-Shirt Licensing Agreement Redacted 7.21.08.pdf |

Richard:

I have attached a redacted version of the licensing agreement. I turn your attention to section 21 which deals with enforcement rights.

Jonas M. Seider, Esq.

---

**From:** LaCava, Richard [mailto:LaCavaR@dicksteinshapiro.com]
**Sent:** Monday, July 21, 2008 9:26 AM
**To:** Jonas Seider
**Cc:** Mark Miller; Turken, James; Siff, Brian; Lambrianakos, Peter; Wright, Fawn
**Subject:** RE: Tattoo Johnny

Jonas,

I still have not yet received the contract with BZ Tees. While you seem to have changed your mind now, you did agree to send a copy of it along with a form of protective order.

Regardless of your statements below that the contract is not a transfer of title document and that Tattoo Johnny does not assign enforcement rights to licensees, Mr. Bollt had no recognition of this contract's terms during his deposition, even though he stated he was the person who negotiated that contract. Therefore, your representation as to what the document contains or does not contain is of no consequence.

I expect to receive a copy of the BZ Tees contract, redacted or not, before 10 am today, or I will be forced to bring this matter to the Judge's attention.

Regards,
Rich


**Richard LaCava**
Dickstein Shapiro LLP
1177 Avenue of the Americas | New York, NY 10036
Tel (212) 277-6659| Fax (212) 277-6501
lacavar@dicksteinshapiro.com

---

**From:** Jonas Seider [mailto:jseider@olenderfeldman.com]

**Sent:** Saturday, July 19, 2008 4:29 PM
**To:** LaCava, Richard
**Cc:** Mark Miller
**Subject:** RE: Tattoo Johnny

Richard:

First and foremost, we did not have an agreement as to the production of the document. I mentioned the confidential nature of the contract and you simply requested that I send it along with a proposed confidentiality and sealing order. I never agreed to send the contract prior to the execution of such an order.

Second, since the contract is not a transfer of title document, it does not fall under the umbrella of Judge Preska's expedited discovery Order. Since Tattoo Johnny does not assign enforcement rights to Licensees, the licensing agreement in question is not a document that transfers title and Tattoo Johnny is indeed the proper party bringing this action. Despite your assumption, Tattoo Johnny indeed retains the rights of enforcement. As such, on Monday morning, I will forward you a redacted copy of the Licensing Agreement that will settle any questions you may have with regard to any standing issue. Once again, since Tattoo Johnny does not assign the right of enforcement, this document does not fall within the scope of Judge Preska's Order and thus we have complied with said Order.


Jonas M. Seider, Esq.

---

**From:** LaCava, Richard [mailto:LaCavaR@dicksteinshapiro.com]
**Sent:** Saturday, July 19, 2008 3:18 PM
**To:** Jonas Seider
**Cc:** Lambrianakos, Peter; Turken, James; Siff, Brian; Wright, Fawn
**Subject:** RE: Tattoo Johnny
**Importance:** High

Jonas,

I am very disappointed to learn that you have now changed our agreement regarding the BZ Tees license.

You are correct to note that Judge Preska's Order requires the production of documents regarding title to the works in question in this litigation. Mr. Bollt's testimony regarding this contract indicated that this is an exclusive contract with BZ Tees. As is common in exclusive contracts dealing with copyrights, the exclusive licensee may be the proper party with standing to sue for infringement. Accordingly, this contract is highly relevant to title of the works in question.

If you have any issue in releasing a confidential document without a protective order in place, please let me know and we can have a joint conference with Judge Preska on Monday extending all dates until such time as she signs a protective order. If you do not wish to have a conference with Judge Preska regarding this and still refuse to produce the document, we can only assume that it contains language that is adverse to Tattoo Johnny's claim of title and standing in this matter. In such a case, we will be contacting Judge Preska about this matter Monday morning and request that all dates be extended until we have had sufficient time to review this contract with BZ Tees, and/or request that Tattoo Johnny's motion for preliminary injunction be denied for failure to comply with the Judge's Order.

Please let me know how you would like to proceed in this matter.

Best regards,
Rich

**Richard LaCava**
Partner
Dickstein Shapiro LLP
1177 Avenue of the Americas | New York, NY 10036
Tel (212) 277-6659| Fax (212) 277-6501
lacavar@dicksteinshapiro.com

---

**From:** Jonas Seider [mailto:jseider@olenderfeldman.com]
**Sent:** Saturday, July 19, 2008 12:37 PM
**To:** LaCava, Richard
**Subject:** RE: Tattoo Johnny

Richard:

I have attached to this e-mail the Western Union pay receipt for Andrea and Ale which represents payment for the eagle.

As I mentioned yesterday, the contract with BZ Tees is a confidential document. Also, since the expedited discovery order for the preliminary injunction hearing only requires us to hand over creation and title documents regarding the works and the contract does not fall into either category of document, I don't believe you are entitled to this document at this time.   I would be happy to consider your reasons for requesting this document at this time.  However, because this is not a title or creation document, Judge Preska's order does not require us to produce the contract.

After considering your reasons, notwithstanding, if it were to be produced, we would need a confidentiality and sealing order regarding the document's use and dissemination.

Best,

Jonas M. Seider, Esq.

**From:** LaCava, Richard [mailto:LaCavaR@dicksteinshapiro.com]
**Sent:** Friday, July 18, 2008 5:11 PM
**To:** Jonas Seider
**Cc:** Filomena Arce
**Subject:** RE: Tattoo Johnny

Jonas:

Thank you for the e-mail and attachments.  I still have not yet received the copy of the contract with BZ Tees.  Please send me that right away.

Best regards,

**Richard LaCava**
Partner
Dickstein Shapiro LLP
1177 Avenue of the Americas | New York, NY 10036
Tel (212) 277-6659| Fax (212) 277-6501
lacavar@dicksteinshapiro.com

---

**From:** Filomena Arce [mailto:farce@olenderfeldman.com]
**Sent:** Friday, July 18, 2008 2:50 PM
**To:** LaCava, Richard
**Cc:** Jonas Seider
**Subject:** Tattoo Johnny

Dear Mr. LaCava:

Please see the attached from Jonas Seider.  Mr. Seider will be contacting you regarding these attachments.  Thank you.

Filomena Arce
Legal Assistant
farce@olenderfeldman.com
OlenderFeldman LLP
2840 Morris Avenue
Union, New Jersey 07083
(908) 964-2487
(908) 810-6631- fax

29 West 38th Street - 17th Floor
New York, New York 10018
212-764-8905 (facsimile)

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

This e-mail is confidential and may well be legally privileged. If you received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes or disclose its contents to any other person. To do so could violate state and federal privacy laws. Thank you for your cooperation.

---------------------------------------------------------

This e-mail message and any attached files are confidential and are intended solely for the use of the addressee(s) named above. This communication may contain material protected by attorney-client, work product, or other privileges. If you are not the intended recipient or person responsible for delivering this confidential communication to the intended recipient, you have received this communication in error, and any review, use, dissemination, forwarding, printing, copying, or other distribution of this e-mail message and any attached files is strictly prohibited. Dickstein Shapiro reserves the right to monitor any communication that is created, received, or sent on its network.  If you have received this confidential communication in error, please notify the sender immediately by reply e-mail message and permanently delete the original message.

To reply to our email administrator directly, send an email to postmaster@dicksteinshapiro.com

Dickstein Shapiro LLP
http://www.DicksteinShapiro.com
=================================================================
--------------------------------------------------------
This e-mail message and any attached files are confidential and are intended solely for the use of the addressee(s) named above. This communication may contain material protected by attorney-client, work product, or other privileges. If you are not the intended recipient or person responsible for delivering this confidential communication to the intended recipient, you have received this communication in error, and any review, use, dissemination, forwarding, printing, copying, or other distribution of this e-mail message and any attached files is strictly prohibited. Dickstein Shapiro reserves the right to monitor any communication that is created, received, or sent on its network.  If you have received this confidential communication in error, please notify the sender immediately by reply e-mail message and permanently delete the original message.

To reply to our email administrator directly, send an email to postmaster@dicksteinshapiro.com

Dickstein Shapiro LLP
http://www.DicksteinShapiro.com
=================================================================
--------------------------------------------------------
This e-mail message and any attached files are confidential
and are intended solely for the use of the addressee(s)
named above. This communication may contain material
protected by attorney-client, work product, or other

7/21/2008

privileges. If you are not the intended recipient or person
responsible for delivering this confidential communication
to the intended recipient, you have received this
communication in error, and any review, use, dissemination,
forwarding, printing, copying, or other distribution of
this e-mail message and any attached files is strictly
prohibited. Dickstein Shapiro reserves the right to monitor
any communication that is created, received, or sent on its
network.  If you have received this confidential
communication in error, please notify the sender
immediately by reply e-mail message and permanently delete
the original message.


To reply to our email administrator directly, send an email
to postmaster@dicksteinshapiro.com

Dickstein Shapiro LLP
http://www.DicksteinShapiro.com
========================================================================

EXHIBIT  G



## Master Licensing Agreement

This Master Licensing Agreement (this "Agreement") is made on this 19th day of May, 2008 ("Effective Date"), by and between Tattoo Johnny, Inc. a New Jersey Corporation ("Licensor"), whose address is 1510 Highway 74 N, #216, Tyrone, GA 30290 and BeeZeeTees, Inc. ("Licensee"),

WHEREAS, Licensor is the owner and/or authorized licensor of certain designs described on Schedule A attached hereto (each a "Work" and collectively, the "Works"), all as more particularly set forth herein;

WHEREAS, Licensee desires an exclusive license with respect to the Works to be produced by Licensee on the products described on Schedule B (collectively, the "Goods");

WHEREAS, Licensee will be selling the Goods through approved retailers ("Retailers") throughout the United States, its territories and Canada (collectively, the "Territory"); and

WHEREAS, Licensee also desires to use Licensor's trademarks described on Schedule C attached hereto (the "Trademarks") on the Goods incorporating reproductions of the Works.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1. Grant of License.

# REDACTED

2. The Term and Termination.

   (a)   *Term.*

   (b)   *Termination.*              # REDACTED

i.

REDACTED

ii.

(c)    *Effect of Termination.*

REDACTED

3.  Artwork.

REDACTED

4.  Distribution Channels.

REDACTED

5.  Royalties/Other Payments.

REDACTED

REDACTED

6.  Payment; Statements of Account; Books and Records.

(a)
(b)
(c)           REDACTED
(d)

7.  Exclusivity.

(a) *Exclusivity for the Goods.*

REDACTED

(b) *Exclusivity Threshold.*

REDACTED

(c) *Non-exclusivity.*

8. Confidential Information.

REDACTED

9. Quality Control.

REDACTED

**10. Branding.**

REDACTED

**11. Approval of Goods.**

REDACTED

**12. Marketing Commitment.**

REDACTED

**13. Insurance.**

REDACTED

14. Representations and Warranties of Licensor.

    (a)

    (b)            REDACTED

    (c)

15. Disclaimer of Warranties.        REDACTED

16. Acknowledgments by Licensee.

                  REDACTED

17. Conditions.        REDACTED

18. Indemnification.

    (a)

                  REDACTED

(b)

REDACTED

19. Force Majeure.

REDACTED

20. Assignment.

21. **Intellectual Property Rights.** Licensee shall give prompt notice to Licensor of all actual or suspected violations of Licensors' rights in the Works and in the Trademarks occurring in the Territory. Thereafter, Licensor shall consult with Licensee regarding what measures, if any, should be undertaken to enforce Licensor's rights in the Territory. Licensor shall have the right to enforce throughout the Territory, in its own name or that of Licensee, all rights to the Works and Trademarks. In the event that Licensor decides not to pursue action against an alleged infringer, Licensee shall have the right to do so (at Licensee's sole cost and expense), unless pursuit of such an action would reasonably be expected to have a negative impact on Licensor's business (for example, suit against an important retail partner of Licensor). Licensor shall assist Licensee in any manner reasonably requested in any such action or proceeding. The expenses for such action or proceeding by Licensee will be borne exclusively by Licensee and any recovery shall be retained by Licensee; provided, however, in the event that the reason for such action or proceeding is due to Licensor's actions or breach of its representation or warranties, then the cost of such action or proceeding shall be paid for by Licensor.

22. **Promotion.**

23. **Notices.**                    REDACTED

24. General Provisions.

    (a)    *Independent Contractor.*

REDACTED

    (b)    *Choice of Law.*

REDACTED

    (c)    *Successor Obligation.* This Agreement shall bind and inure to the benefit of the heirs, successors, assigns and personal representatives of the parties hereto.

    (d)    *Survivability.* Sections 2(e), 3, 5, 6, 8, 14, 15, 16, 18, 20 and 21 shall survive termination of this Agreement.

    (e)    *Enforceability.* If any term or provision of this Agreement is illegal or unenforceable, then, nonetheless, this Agreement shall remain in full force and effect and such term or provision shall be deemed deleted or curtailed to such extent as is necessary to make it legal or enforceable.

    (f)    *Entire Agreement.* This Agreement represents the complete understanding between the parties as to its subject matter and supersedes all prior understandings, if any, as to its subject matter.

    (g)    *Amendment.* No modification or amendment, nor any promise, waiver or representation (past, present or future) shall be valid or binding unless made in writing and signed by the party to be bound thereby.

    (h)    *Legal Representation.* Each party acknowledges that it has had an opportunity to consult with legal counsel of their choosing in the negotiation and execution of this Agreement.

    (i)    *Confidentialty of Agreement.* Except as required by law, both parties hereby agree to keep confidential the terms of this Agreement and this obligation shall survive the Term.

IN WITNESS WHEREOF, intending to be legally bound, the parties hereby execute this Agreement as of the Effective Date.

LICENSOR:

Tattoo Johnny, Inc.,

By: _____

Name: ___DAVID BOLT___

Title: ___OWNER___

LICENSEE:

Bee Zee Tees

By: _____

Name: _____

Title: ___PRESIDENT___

### SCHEDULE A
#### (Works)


Tattoo Johnny branded artwork

**SCHEDULE B**
(Goods)

Children's Apparel: Infant creepers (onesies), toddler
Adult Apparel: Mens. jrs. tees, sweats. and imprinted tops
Accessories: Stickers. decals. pens etc. (non-exclusive)

**SCHEDULE C**
(Trademarks)
©2007 Tattoo Johnny, Inc. all rights reserved.

**SCHEDULE D**
(Approved Channels)

REDACTED